UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

KAREN ROBERTS and FRANK ROBERTS,
  *Plaintiffs*,

   v.

CITY OF NEW HAVEN *et al.*,
  *Defendants*.

No. 3:08-cv-00670 (JAM)

**ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

  During a "live-fire" police training exercise, plaintiff Karen Roberts was shot more than a dozen times with simulated ammunition by her fellow police officers of the New Haven Police Department. She and her spouse—plaintiff Frank Roberts—claim that her colleagues shot her well beyond what was necessary for training purposes in order to retaliate for a controversial letter-to-the-editor that Frank had recently published in the local newspaper. Karen otherwise claims that—whatever their motive—her colleagues used excessive force on her and that her supervisors did not do enough to protect her.

  The principal question now before me is whether the United States Constitution affords a remedy for the injuries to Karen that occurred during the training exercise. In light of the facts presented on this record, I conclude that neither Karen nor Frank have established a genuine issue of fact to sustain their constitutional claims. Accordingly, I will grant defendants' motion for summary judgment as to plaintiffs' federal law claims and will otherwise dismiss the remaining state law claims for lack of federal jurisdiction.

**BACKGROUND**

The following facts are based on the parties' submissions and are viewed in the light most favorable to plaintiffs.[1] Plaintiffs Karen Roberts and her husband Frank Roberts were both officers with the New Haven Police Department (NHPD). By 2006, Frank had retired from the force, while Karen continued to serve. In February of 2006, the NHPD established a new "elite crime interdiction unit" to help fight violent crime in the city. In mid-April, Frank wrote a letter that was published in the New Haven Register criticizing this new unit.

Following the letter's publication, Karen began to face hostility from her fellow officers. Officers would be less friendly with her, or make negative comments to or about her. On at least one occasion, Karen called for back-up when out on the beat, but did not receive support quickly from her fellow officers. *See* Doc. #33-3 at 19-21. Karen did not make any formal complaints to her supervisors about this treatment. *See* Doc. #47-6 at 13.

The crucial incident occurred on May 4, 2006. On that day, Karen participated in a police training exercise conducted by the NHPD in which officers, armed with non-lethal marking ammunition called "Simunition," had to chase an "aggressor," similarly armed with Simunition, into a building. Karen and her partner were instructed for this training exercise to wear a full-face helmet, facemask, and protective chest armor, along with regular police uniform pants.[2] Karen received two magazines of 9mm Simunition and a 9mm firearm that had been modified to use Simunition in place of the standard ammunition. Simunition is commonly used for police training, and it may be safely fired from distances greater than one foot. *See* Doc. #47-1 at 19;

---

[1] Both the individual defendants and the City of New Haven have filed statements of material facts with citations to supporting evidence (Docs. #30, #33). To the extent that plaintiffs' own statements of material facts (Docs. #46-1, #46-2, #63) simply deny factual allegations of defendants' statements but without identifying contrary admissible evidence, the Court credits defendants' factual assertions. *See* D. Conn. L. Civ. R. 56(a)(3).

[2] Karen stated in her deposition that although uniform pants were recommended, she was also told she could wear jeans. Doc. #30 at 17.

2

*see also Moore v. Guthrie*, 438 F.3d 1036, 1038 (10th Cir. 2006) (describing common use of Simunition for police "live fire" training exercises and noting that "because Simunition is intended as a combat training tool, Simunition cartridges are specifically designed to be painful to a person on impact; the Simunition manufacturer refers to this characteristic as 'impact penalty,'" and that "a Simunition projectile striking unprotected skin will leave bruises, welts, and abrasions").

Participants were briefed on safety and underwent a classroom instruction session on using Simunition. The aggressors and participants were supposed to be unknown to each other, with identities obscured by the protective gear, but all the officers and aggressors waited in one hallway before beginning the exercise, and it was possible to identify officers even with the protective gear on.

The training exercise began when pairs of officers pulled over a car and were fired upon by the fleeing driver, who then entered a building. The officers were supposed to follow the aggressor into the building and then to conduct a room-by-room search for the aggressor. After pulling over the vehicle and chasing the aggressor into the building, Karen and her partner conducted a search of the dark building. As indicated in a training video that was taken of the exercise, when the officers entered the building, one officer was wearing a light sweatshirt and the other (Karen) was wearing a dark sweatshirt, with long, dark hair visible from beneath the protective gear. One officer was also visibly larger and taller than the other officer (Karen). The two officers entered a dark locker room; then they turned a corner into an area with restroom stalls. Both officers opened fire directed towards a corner, but the target could not be seen. The other officer entered the shower area, which did not have a door but did have a doorway opening, while Karen told the aggressor to "Put your hands up!"

Karen then entered the shower area. It appears in the video that both officers were in the shower chamber at this point. It is not clear from the video if there were any aggressors in the shower chamber, but officers continued to shoot out through the doorway of the shower chamber at any aggressors who were presumably across the restroom. The video shows Karen extending her gun out of the open shower and firing straight ahead; it does not appear that the other officer was shooting out of the doorway.

An aggressor then ran from behind the videographer (who was standing in the doorway to the restroom area) and shot through the doorway of the shower chamber. At that point there were two aggressors in the restroom area. One of the aggressors moved towards the doorway opening and stood off to the right side of the doorway. The aggressor shot through the doorway towards the location where Karen was crouching. After a short period, Karen exited the shower chamber to tackle the shooter. An airhorn sounded, and the exercise ended. Karen had been shot at least fourteen times, mostly in the area of her legs which did not have armor protection. She was clearly upset, and her hands and clothing had marks of bright color on them.[3]

Karen does not know which of the aggressors shot her. It is not disputed that defendants Jamie Sanchez, Charles Tyson, and Robert Maturo were serving as the aggressors that day for the training exercise. *See* Doc. #33-1 at 3. Defendant Sanchez discovered during the exercise that her gun was jammed, and she fired no shots during the exercise; accordingly, only Tyson and/or Maturo shot Karen that day. Defendants Thaddeus Reddish and Robert Strickland

---

[3] Plaintiffs claim in the complaint that Karen was shot at least seventeen times in her legs and twice in her left hand, at point blank range. *See* Doc. #1 at 5. I could find no admissible evidence, other than the video, submitted about specifically what happened in the training exercise, including how close the aggressor was. Karen adduced medical records that indicated she reported being hit between fourteen and fifteen times throughout the exercise. Deposition testimony was submitted regarding the quality of safety instruction that Karen received, and Karen's belief that the training should have been changed to not permit firing with Simunition from within three feet, but Karen did not state in her deposition (at least, not in the pages given to the Court) the distance from which she was shot, nor the number of times she was shot. *See* Doc. #47-6 at 17.

were supervising the training and were present during the exercise. Defendants Francisco Ortiz (who was then the police chief) and Kay Coddish were not present during the exercise. After the exercise, Karen complained to Chief Ortiz, who indicated that he would investigate, but did not investigate.

Counts One and Two of the complaint allege causes of action under 42 U.S.C. § 1983 and 42 U.S.C. § 1985 that defendants Sanchez, Maturo, Tyson, and Ortiz violated Karen's and Frank's constitutional rights under the First, Fourth, and Fourteenth Amendments. Count Three of the complaint alleges that defendants Coddish, Strickland, and Reddish violated Karen's constitutional rights by failing to train or supervise the officers or to properly equip her in connection with the training exercise. The remaining counts of the complaint allege state law claims as well as a § 1983 *Monell* claim of liability against the City of New Haven on alleged grounds that the City was deliberately indifferent to plaintiffs' constitutional rights. All defendants now seek summary judgment as to all claims against them.

## DISCUSSION

The principles governing a motion for summary judgment are well established. Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (*per curiam*). "A genuine dispute of material fact exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013). The evidence adduced at the summary judgment stage must be viewed in the light most favorable to the non-moving party and with all ambiguities and reasonable inferences drawn against the moving party.

*See, e.g.*, *Tolan*, 134 S. Ct. at 1866; *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013). All in all, "a 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan*, 134 S. Ct. at 1866 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

### *State Action*

To the extent that plaintiffs premise their claims on conduct by the defendants during the police training exercise, defendants contend that they "did not employ their police powers in the context of the training exercise," such that they were not "state actors" and acting "under color of law" in their capacity as participants in the training. Doc. #32-1 at 8. I do not agree. As the Supreme Court has made clear, "the traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *West v. Atkins*, 487 U.S. 42, 49 (1988). Thus, "state employment is generally sufficient to render the defendant a state actor," and "it is firmly established that a defendant in a § 1983 suit acts under color of state law when he abuses the position given to him by the State." *Id.* at 49–50.

Here, although it is true that defendants allegedly inflicted harm upon a co-worker rather than upon an ordinary citizen and that they did so in the context of posing as non-police "aggressors" for purposes of a training exercise rather than as ordinary patrol officers, they were put in the position that they were in during the training exercise solely by virtue of their official positions and employment with the city police department. Defendants' argument that they were not "state actors" in the context of the police training exercise is inconsistent with the recognized scope of constitutional rights. The Fourth Amendment, for example, "guarantees the privacy, dignity, and security of persons against certain arbitrary and invasive acts by officers of the

Government, without regard to whether the government actor is investigating crime or performing another function," including "when the Government acts in its capacity as an employer." *City of Ontario, Cal. v. Quon*, 560 U.S. 746, 755–56 (2010).

This is not a case about off-duty conduct or on-duty horseplay that was unrelated to the defendants' execution of their official duties. *See, e.g.*, *Patterson v. County of Oneida*, 375 F.3d 206, 230-31 (2d Cir. 2004). Accordingly, I conclude that the defendant officers were state actors and acting under color of law for purposes of any harm for which they would otherwise be liable that occurred during the police training exercise. *See Gray v. Kern,* 2014 WL 1344275, at *2 (D. Md. 2014) (police officers were state actors for purposes of shooting of co-officer during training exercise).

### *Count One - § 1983 Claim for Retaliation and Excessive Force*

Count One aggregately alleges violations under 42 U.S.C. § 1983 of multiple constitutional rights. I understand these claims to include a claim of First Amendment retaliation and a claim of an unconstitutional use of excessive force. I will address both these claims in turn.[4]

*First Amendment Retaliation*

The First Amendment protects the right to free speech and to association as well as the right not to be subject to retaliation for the exercise of one's right to free speech or association. In order to prove a claim of First Amendment retaliation, a plaintiff must show that: (1) he has engaged in protected speech or association; (2) defendant took adverse action against him; and (3) there was a causal connection between the protected speech or association and the adverse

---

[4] Count One of the complaint (involving 42 U.S.C. § 1983) alleges a violation of only Karen's constitutional rights, while Count Two of the complaint (involving 42 U.S.C. § 1985) alleges a violation of both Karen's and Frank's constitutional rights. For simplicity sake, I will address my discussion of the constitutional claims below with respect to both Karen and Frank.

action. *See Gonzalez v. Hasty*, 802 F.3d 212, 222 (2d Cir. 2015); *Dolan v. Connolly*, 794 F.3d 290, 294 (2d Cir. 2015) (same).

Not every perceived slight constitutes "adverse action" subject to a First Amendment retaliation claim; to the contrary, "in the context of a First Amendment retaliation claim, we have held that only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action." *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 225 (2d Cir. 2006). For a claim—as here—involving speech by a government employee, the speech is entitled to protection only if the employee speaks as a citizen on a matter of public concern. *See, e.g.*, *Matthews v. City of New York*, 779 F.3d 167, 172 (2d Cir. 2015).

Here, I will assume that Frank's letter to the newspaper was protected speech by a government employee. I will further assume that his right not to be subject to retaliation for his exercise of free speech extends not only to retaliation by a state actor directly against him but also to retaliation against his spouse or other family member to the extent that such retaliation would deter Frank's exercise of free speech. Likewise, although I doubt it to be so, I will assume for present purposes that Karen's association with Frank touched on a matter of public concern. *See Cobb v. Pozzi*, 363 F.3d 89, 103 (2d Cir. 2004).

Even with all these assumptions, however, plaintiffs' First Amendment claims fall short, because there is no genuine issue of fact to show that any of the possibly culpable defendants intended to retaliate against Karen or Frank. To begin with, the complaint identifies adverse conduct by unnamed police officers in the days following publication of Frank's letter in mid-April. Except quite equivocally as to defendant Sanchez, there is no evidence that any of these adverse actions involved any of the defendants named by plaintiffs in this lawsuit. *See* Plaintiffs'

Local Rule 56(a)(1) Statement, Docs. #46-1 and #46-2; Doc. #47-6 at 6 (deposition testimony of Karen Roberts that she had "no issue" with Jamie Sanchez prior to the training exercise).[5]

As to the firing upon Karen with Simunition multiple times during the live-fire training exercise, the evidence shows that it was only Maturo and/or Tyson who fired upon Karen in their "aggressor" roles during the training exercise. Although Sanchez was also an assigned "aggressor" during the exercise, it is undisputed that Sanchez's training gun was inoperable during the exercise. *See* Doc. #33-1 at ¶ 27-28; Doc. #55-9 at 28; Doc. #63 at 4. Plaintiffs have not shown any genuine fact issue of ill-will by Maturo or Tyson against them, and they have not shown any genuine fact issue that Sanchez caused any harm.

Likewise, it is undisputed that Ortiz—who was then the Chief of Police—was not physically present during the exercise, and there is no evidence to show that he instructed any officer to harm Karen during the training exercise. *See* Doc. #33 at 6; Doc. #63 at 5. Beyond the sheerest of speculation, there is no individual-specific evidence to suggest that any of the named defendants harbored some speech-related or association-related animosity against plaintiffs, such that they decided to retaliate against Karen during the live-training exercise. Accordingly, I will grant defendants' motion for summary judgment with respect to plaintiffs' First Amendment claims.

*Excessive Force*

Karen contends that defendants violated her substantive due process rights by means of their use of excessive force during the training exercise. The Fourteenth Amendment to the United States Constitution provides that a State shall not "deprive any person of life, liberty, or

---

[5] The time frame here covers an approximately three-week period from the April 15 letter until the May 6 training exercise. During her deposition, Karen stated that Sanchez "stopped talking" to her after the letter was published. Doc. #33-3 at 11. She further stated that Sanchez and another member of the elite unit took a long time to get to a call for which she called for backup, and then ignored Karen once they arrived. *Id.* at 18-19.

property, without due process of law." U.S. Const., Amdt. 14, § 1. The Due Process Clause protects both a right to "substantive" due process and "procedural" due process. A substantive due process claim requires a plaintiff to show that a government official has deprived plaintiff of a fundamental constitutional right and that he has done so under circumstances that are no less than "arbitrary" and "outrageous," typically as demonstrated by conduct that "shocks the conscience." *See, e.g.*, *United States v. Medunjanin*, 752 F.3d 576, 590 (2d Cir. 2014) (substantive due process has generally protected "matters relating to marriage, family, procreation, and the right to bodily integrity"); *Natale v. Town of Ridgefield*, 170 F.3d 258, 262–63 (2d Cir. 1999) (substantive due process standards violated "only by conduct that is so outrageously arbitrary as to constitute a gross abuse of governmental authority"); *Velez v. Levy*, 401 F.3d 75, 93–94 (2d Cir. 2005) (describing the "shocks the conscience" standard).

A claim against law enforcement authorities for the use of excessive force outside the arrest/seizure or imprisonment context is properly considered under the Due Process Clause. *See Rodriguez v. Phillips*, 66 F.3d 470, 477 (2d Cir. 1995).[6] For such cases, the Second Circuit instructs courts to consider the following factors: "[1] the need for the application of force, [2] the relationship between the need and the amount of force that was used, [3] the extent of injury inflicted, and [4] whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 251–52 (2d Cir. 2001) (numerical brackets added).

---

[6] Although plaintiffs alleged in the complaint a violation of the Fourth Amendment, defendants argue that there is no evidence that Karen was "seized" or her freedom of movement terminated during her encounter with the defendants. *See, e.g., County of Sacramento v. Lewis*, 523 U.S. 833, 843-44 (1998) (noting that "a police pursuit in attempting to seize a person does not amount to a 'seizure' within the meaning of the Fourth Amendment and that "the Fourth Amendment covers only 'searches and seizures,' neither of which took place here"). Because plaintiffs' opposition to defendants' summary judgment motion fails to address this claim, I consider plaintiffs' Fourth Amendment claim to be abandoned in lieu of the substantive due process claim discussed above.

Here, as noted above with respect to my discussion of plaintiffs' First Amendment claim, there is no evidence that any of the defendants acted for malicious and sadistic reasons to shoot excessively at Karen's unprotected leg area. Although defendant Sanchez was a member of the police unit that was subject to criticism in Frank's letter, her firearm was not operable during the training exercise. There is no genuine fact issue of malice on the part of Maturo or Tyson—the only two officers who possibly shot Karen—or any of the other named defendants. Accordingly, plaintiffs have not adduced evidence on the most important of the substantive due process factors: whether the defendants acted maliciously and sadistically to cause her harm. *See Johnson*, 239 F.3d at 252 (discussing how malicious and sadistic use of force is "presumptively unconstitutional," because "the substantive due process guarantee of the Fourteenth Amendment protects individuals from 'conscience-shocking' exercises of power by government actors").

Given the absence of evidence of malice, the defendant officers are entitled at the least to qualified immunity, even if the force that Maturo and/or Tyson used in the heat of the moment of a verisimilitudinous "live fire" training exercise was unfortunately and zealously disproportionate to what they should have used with the benefit of hindsight. Indeed, the doctrine of qualified immunity protects police officers "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). It follows that a police officer is entitled to qualified immunity if "(1) his conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or (2) it was objectively reasonable for him to believe that his actions were lawful at the time of the challenged act." *Simpson v. City of New York*, 793 F.3d 259, 268 (2d Cir. 2015). Given the context presented—and assuming that Tyson and/or Maturo fired more shots at Karen

than reasonably necessary—I cannot conclude that an objectively reasonable law enforcement officer would have known that this conduct violated any clearly established constitutional rights.

Nor is there a genuine issue of fact to support Karen's due process claim against Chief Ortiz. There was no evidence presented for summary judgment purposes to show that he directed or caused any officer to harm Karen during the training exercise. *See* Doc. #33 at 6; Doc. #63 at 5. The fact that Ortiz may not have investigated Karen's complaints about the exercise as she requested does not amount to a violation of her constitutional rights.

### *Count Two - § 1985 Claim for Civil Conspiracy*

For the same reasons that I have concluded that summary judgment should be granted for each of the named defendants Maturo, Tyson, Sanchez, and Ortiz as to the § 1983 claim alleged in Count One, I reach the same conclusion for plaintiffs' § 1985 claim for civil conspiracy. In addition, plaintiffs' claims are barred by the intracorporate conspiracy doctrine. *See Hartline v. Gallo*, 546 F.3d 95, 99 n.3 (2d. Cir. 2008) (applying intracorporate conspiracy doctrine to preclude § 1985 action against police department and its officers). Although the doctrine has an exception for "individuals within a single entity when they are pursuing personal interests wholly separate and apart from the entity," *Guichard v. Town of Brookhaven*, 26 F. Supp. 3d 219, 228 (E.D.N.Y. 2014), there is no genuine fact issue to suggest that this exception applies here.

### *Count Three - § 1983 Claim for Failure to Train/Protect Liability*

Count Three of the complaint alleges that defendants Coddish, Strickland, and Reddish violated Karen's constitutional rights because they "had an affirmative duty to train, properly equip and adequately supervise all personnel involved in the exercise," and they were "reckless or deliberately indifferent to the consequences of failing to train or adequately supervise Maturo, Tyson and Sanchez, or to properly equip the Plaintiff." Doc. #1 at 10. According to the

complaint, "the actions of Coddish, Strickland and Reddish constituted a deprivation of the Plaintiff's constitutional right to be protected from intentionally or negligently caused harm and/or excessive risk during a training exercise." *Ibid.*

It is well established that "the Constitution does not guarantee due care on the part of state officials; liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process." *County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998). What is more, the Due Process Clause does not impose a generalized duty on the government to furnish its employees with a safe working environment. *See Collins v. City of Harker Heights*, 503 U.S. 115, 126 (1992). Thus, for example, the Tenth Circuit has declined to recognize a due process claim against a police chief who allegedly failed to furnish adequate protective equipment for a police officer who was participating in a Simunition live-fire training exercise. *See Moore v. Guthrie*, 438 F.3d 1036, 1040–41 (10th Cir. 2006).

In addition, supervisors are not responsible under § 1983 via *respondeat superior* for a subordinate's negligence because "§ 1983 requires individual, personalized liability." *Raspardo v. Carlone*, 770 F.3d 97, 116 (2d Cir. 2014). A supervisor may be held responsible for a subordinate's unconstitutional acts if the supervisor was deliberately indifferent to constitutional violations or grossly negligent in his supervision. *See ibid*. Gross negligence is "the kind of conduct where the defendant has reason to know of facts creating a high degree of risk of . . . harm to another and deliberately acts or fails to act in conscious disregard or indifference to that risk." *Ibid.* Plaintiff must be able to "show an affirmative causal link between the supervisor's inaction and her injury." *Poe v. Leonard*, 282 F.3d 123, 140 (2d Cir. 2002). Just like regular police officers, supervisory police officers may be protected by qualified immunity "so long as

reasonable officials could disagree about whether the supervisor's action was grossly negligent in light of clearly established law." *Raspardo*, 770 F.3d at 116–17.

Here, Karen has failed to establish a genuine issue of material fact that would indicate deliberate indifference or gross negligence in supervision by Coddish, Strickland, or Reddish at the time of the training exercise. The extent of her evidence comes from her deposition testimony that she did not feel that she "learned what [she] was supposed to do in that incident" and that the supervisors did not "show us what cover they thought we should use, what other kind of tactics are available to us." Doc. #47-6 at 16. These statements indicate at best a claim for failure to train Karen, not a failure to train the aggressors who harmed her, and the claim is nonsensical because the very purpose of the training exercise was to train Karen in a live-fire environment.[7]

Plaintiff further admitted that participants were instructed on safety and what equipment to wear. *Id.* at 16-17. Moreover, the required equipment for the exercise matched the minimum, mandatory equipment listed in the Simunition handbook.[8] *See* Doc. #47-1 at 28 (stating that "duty equipment and uniforms" should be worn and that "appropriate optional clothing for role-players should fully cover the arms and legs and hands").

Defendants adduced evidence that officers were instructed on safe firing distances, and that Coddish was not present. *See* Doc. #33-1 at 2. Plaintiffs presented no contrary evidence that the supervisor defendants did not instruct the aggressors in the safe firing distance, nor evidence

---

[7] This interpretation of the failure-to-train complaint is further supported by the deposition of plaintiffs' expert Angelo Appi, who indicated that his opinion of the way the training was held was that it was not well-designed to improve the officers' performance in the field – not that the training of the aggressors in the use of Simunition was inadequate. *See* Doc. #47 at 23-24. Appi did indicate that the exercise should have had a "two hit central mass" limit – meaning two direct shots to an officer's torso – before the instructor stopped the exercise to correct the mistakes made. *See id.* at 14. But there is no evidence from Appi's deposition that in his expert opinion, the supervisors should have stopped any specific behavior in the video from occurring or that the shots in the video were fired from an excessively close distance.

[8] Karen stated in her deposition that although uniform pants were recommended, she was also told she could wear jeans. Doc. #30 at 17. In view that there was no requirement for particular leg covering, I do not conclude that it makes a difference what kind of pants Karen wore.

14

that defendant Coddish was even involved in instructing the aggressors.[9] *See* Doc. #47-6 at 16. In sum, it seems that the training exercise was run by defendants Reddish and Strickland with at least an eye towards the safety requirements of the participants, acknowledging the risk involved and taking action to prevent harm. Such action hardly establishes gross negligence on the part of participating defendants, as gross negligence requires acting or failing to act in disregard of risk.

Nor have plaintiffs shown that the law regarding supervision to prevent excessive force in police training exercises was clearly established such that a reasonable supervisor in the position of these defendants would have known that a constitutional violation was likely to occur. By requiring participants to wear safety equipment in accordance with the handbook, defendants took steps to prevent harm to officers, and could therefore reasonably expect that there would be no uses of force that would "shock the conscience." Perhaps if some officers were forced to participate without safety gear, or with malfunctioning safety gear, there might be facts to suggest a material issue of fact of gross negligence. But I see no such facts here to support a constitutional claim against the defendant training supervisors, much less a claim that could possibly surmount the protections of qualified immunity. *See, e.g.*, *Moore*, 438 F.3d at 1042–43 (affirming qualified immunity for police chief who allegedly failed to furnish plaintiff police officer adequate protective gear for live-fire training exercise).

### *Remaining Claims*

Count Seven of the complaint alleges a *Monell* claim of municipal liability under § 1983 against the City of New Haven. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). But

---

[9] Plaintiffs' response to defendants' statement of material facts indicates that there is deposition testimony regarding safe firing distances, *see* Doc. #63 at 2, but the cited pages of her deposition (74-77) present no *affirmative* evidence that defendants Reddish and Strickland did not instruct the officers on safe firing distance – *i.e.*, that Karen was asked "Were you instructed on safe firing distance?" and that she replied "we were not." Page 111 of the deposition was not provided to the Court.

because I have concluded that there is no genuine issue of fact to support plaintiffs' constitutional claims against any member of the New Haven police department, it is clear that the City of New Haven is entitled to summary judgment as to plaintiffs' *Monell* claim. *See Askins v. Doe No. 1*, 727 F.3d 248, 253 (2d Cir. 2013) (noting that "unless a plaintiff shows that he has been the victim of a federal law tort committed by persons for whose conduct the municipality can be responsible, there is no basis for holding the municipality liable" and that "*Monell* does not create a stand-alone cause of action under which a plaintiff may sue over a governmental policy, regardless of whether he suffered the infliction of a tort resulting from the policy").

Plaintiffs otherwise allege state law tort claims, including for assault and battery, negligent and intentional infliction of emotional distress, and loss of consortium. In light of my grant of summary judgment as to the federal claims in this case and the lack of the parties' attention to the state law tort claims in their briefing, I will decline in my discretion to exercise supplemental jurisdiction over the remaining state law claims. *See* 28 U.S.C. § 1367(c)(3); *see, e.g.*, *Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 117–18 (2d Cir. 2013).

## CONCLUSION

For the foregoing reasons, I GRANT defendants' motions for summary judgment (Docs. #29 and #32) with respect to Counts One, Two, Three, and Seven. I otherwise DISMISS without prejudice plaintiffs' remaining state law claims.

The Clerk is directed to close this case.

It is so ordered.

Dated at New Haven this 26th day of September 2016.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge